Thank you, Your Honors. Margaret Grignot for Kyphon Sarl. And I'd like to reserve five minutes for rebuttal. At its heart, this appeal concerns the defective sailing bag components that were an integral part of the Natrix system that Pabban sold to Kyphon Sarl after warranting that the system was of merchantable quality, free from defects, and suitable for use on patients. But the system was not merchantable as warranted by Pabban. Instead, the sailing bags leaked, and it was the leakage that made the bags leak. Any evidence that the sailing bags leaked when they were in use? Yes, Your Honor. They leaked in the testing that was done when the bags were made of polyethylene. They were then changed to polyurethane. The testing, again, indicated that the bags leaked. They leaked, again, in the physician preference testing that Pabban conducted earlier on, and they leaked after the devices were sent to Kyphon after the agreement was entered into. This was all before the agreement was signed, right? The first three were before the agreement was signed. After the agreement was signed, Pabban or one of its affiliated companies sent 300 devices to Kyphon Sarl. Of those 300 devices, 110 were sterilized and in the Pabban single-tray packaging. The other ones were in the bulk packaging and not sterilized that Kyphon Sarl had requested. The evidence is undisputed that the devices that were in the Pabban single-tray packaging leaked. Absolutely undisputed. There's no evidence to the contrary. Subsequently, Kyphon asked Pabban to conduct blue-dye tests, and in the blue-dye tests, again, 30 devices were sent to Kyphon Sarl in the Pabban single-tray packaging, and those leaked. Wasn't Kyphon Sarl aware of the problems of trying to ship the product and in the process of trying to determine what kind of packaging would be used? One of the theories was that there was something in the packaging that was clipping the corners or working the seams on the saline bags. Your Honor, there were problems with the packaging, and the packaging was subject to a different warranty under 3.9 instead of 3.16 of the asset purchase agreement. But the evidence is that the packages or that the bags leaked under any and all conditions. So regardless of whether it was in the Pabban packing or in the bulk packaging, the bags leaked. Did it primarily leak when it was being shipped? After the APA was signed? After the APA was signed, the only evidence is that it leaked after it was shipped. Okay. So the problem seems to be the packaging and the shipping, not sort of a freestanding device that all of a sudden is just leaking on a hospital floor. Well, Your Honor, I disagree. Because it leaked previously, before the shipping. In other words, before the agreement, we have evidence that it leaked. But after the APA was signed, it only leaked after it had been shipped. Is that correct? There's no evidence that it leaked in the hands of... So the only evidence that you had was that it was leaking after it had been shipped. Yes, Your Honor. Before you move further on in the narrative, wasn't there either an agreement or a representation that the bag would be changed anyway, right? There was not an agreement or a representation. After it was brought, after Kaipansaro recognized that there were problems with the bags, they tried to fix the problem. And the fix was they would change the bag to polyurethane or something like that, right? No, Your Honor, that had already been done. That had already been done? That had already been done. It had been changed from polyethylene to polyurethane, and the bag still leaked. They've leaked from the beginning. And what happened was when Kaipansaro got the bags and realized that they leaked and that it had nothing to do with packaging or testing, that the bags just leaked, then they were not very happy, obviously, with PABAN and tried to come up with a fix. They talked to Polizen, who was the company that sold the bags. They did the blue dye testing, and in every way they could not resolve the problem. It was not the shipping. And let me just tell you one other piece of evidence that reflects that. In the month after the shipping, Mr. Stark sent an email that said he recognized and acknowledged that the seams in the bags were faulty. So from PABAN's own witness, the seams were faulty, the welds were faulty. They did not have bags that met the representations of warranties. You presented all this to the jury? Yes, Your Honor. So it's our position, of course, that there's no substantial evidence to support the jury's finding because the bags were defective and PABAN knew they were defective and had warranted that they were not defective. So here's what PABAN knew. First of all, it represented that to the actual knowledge of PABAN's three designs. I'm sorry, just to make sure that I understand where you're going. So right now the argument that you're presenting to us is that it was error for the district court to fail to direct a verdict for you. Is that the argument you're making? That's the argument I'm making now, Your Honor. So the jury could not find the way that it found? Yes, Your Honor. Could not find. And then alternatively, the weight of the evidence doesn't support the verdict. When you say could not find because there would be no evidence to support such a verdict, or is it because the instruction was wrong or both?  And then if the court disagrees with that, we're entitled to a new trial because of the weight of the evidence and also the instructional error. With respect to going back to the judgment again, PABAN warranted that to the actual knowledge of its three designated key personnel that the device was merchantable, free from defects, and suitable for use on patients. And that wasn't true. Of the three key personnel, two of them knew that it wasn't saleable to physicians for use on patients and said so and testified so. And the other one didn't have any idea what the answer was. Where does the for use on patients language arise? That comes from suitable for its intended use, Your Honor, and that the devices were to be used by physicians. That's what they've been tested for, to be used by physicians for use on patients. And that's the three warranties that they gave, combination of merchantable, free from defect, and suitable for its intended use. Was there a dispute, though, as to whether or not that was for use on patients? Was that an issue that the parties disputed? No, not at all, Your Honor. In fact, the physician preference testing that PABAN had conducted was on patients, so they had brought the devices to the physicians, and the physicians had used them on patients. And some of those physicians complained, by the way, that the saline bags leaked. So, again, there's some more evidence that not related to shipping because those bags weren't shipped. They were hand-delivered to the doctors in the operating rooms, and they leaked. So Harry Herbert, the CEO of PABAN and its affiliated companies, testified that at the time of the agreement, the Natrix system could not be sold to physicians commercially for use on patients. Bill Stark, the individual in charge of manufacturing, testified that the Natrix system did not meet the reliability level necessary to be sold commercially to physicians for use on patients. And, again, Larry Green had no information whatsoever. That meant that contrary to PABAN's express warranty, none of the three had actual knowledge that the system was merchantable, of commercially acceptable quality, or saleable to physicians. And two of them knew for sure that it wasn't. So the warranty was breached, and as a result, the agreement provided that if PABAN breached the warranty, the 3.16 warranty, then Kaif and Saral was not required to make any further payments under the agreement. Kaif and Saral paid $18.75 million up front, and the agreement said that if the warranty was breached, Kaif and Saral didn't have to make any further payments. And so for that reason, because the warranty was breached, the saline bag was defective, then— What's the appropriate remedy in contracts for the breach of the agreement? Do you rescind the agreement? No, Your Honor. This agreement actually is major companies. They know what they're doing. So this agreement has a couple of provisions. First of all, it says that Kaif and Saral is going to pay $18.75 million, and then there are limitations that restrict Kaif and Saral to breach. It can't get that money back. That money goes to PABAN regardless of any misrepresentations. But Kaif and Saral gets to keep the product. Yes, yes. And, on the other hand, if it is breached, then PABAN doesn't get any more money. That's all they get. So they weighed the risk and benefits, and PABAN got, for sure, $18.75 million, and Kaif and Saral only had to pay the rest if the warranties were accurate. Could you address the point made by your opponent as to whether or not that warranty would be breached if the key personnel simply didn't know? If the product was perfectly fine but the key personnel didn't know? If the key personnel didn't know of any defects and there were no defects, then the warranty would not be breached. But they didn't simply warrant that there were no defects. What they warranted was something affirmative, and that's what the real problem is here. They warranted that the system was merchantable and suitable for use on patients. And you can't warrant that. You can't warrant that unless you have knowledge. So you can't say, oh, I can warrant that, and then if I don't know anything, I've met the warranty. You can warrant that with respect to defects, for example. You can say, I warrant that I don't know of any defects. That's fine. But it's very different from merchantability and suitable for its intended use. Those require some affirmative knowledge that the system is, in fact, merchantable and suitable for its use. Alternatively, the district court's instructional error requires reversal and a new trial. This gets sort of in answer to your question, Your Honor. Instead of requiring Paben to prove that the Natrix system was affirmatively merchantable to physicians and suitable for use on patients, the district court instructed the jury that if they found that the three key personnel did not actually know that the Natrix system was not merchantable, not free from defects, and not suitable for use on patients,  In addition to being confusing and misleading, this instruction effectively eviscerated Paben's affirmative warranties, instructed the jurors to find in favor of Paben on the basis of absence of knowledge, impermissibly shifted the burden of proof to Kaifon Sorrow, and led to a verdict that was unsupported by the evidence. Now, did you object to that instruction in district court on the same basis that you're objecting now? Yes, we did, Your Honor. They said that we didn't. First of all, we proposed an instruction that was based on the knowledge of the three, affirmative knowledge of the three, and did not have the misleading double negative that the district court included in her own instruction. After she proposed her own instruction, we again objected on that basis, and we also objected to some of Kaifon's proposed instructions in this area as well. So the argument about waiver is misguided. Counsel, you're down to under two minutes. Do you wish to reserve some time? I'll reserve some time, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, Joseph E. Thomas, on behalf of Thomas White Law and Calligraph for the Paben development and related respondents. Where to begin with this? I was lead trial counsel. I know the record very well because I was there. Most of what I heard from my opponent today about what's in that record is just not correct. There's no other polite way to say this. It's not true at all. The evidence, if you look at the evidence we cited throughout our briefs, this product was a product we developed over a period of years. In 2006, we tested a polyethylene bag. We discovered that that wouldn't work. We switched the bag material in 2007, a year before this contract signed, and tested the polyethylene bag. We tested it, full performance testing. The undisputed evidence is that it passed every one of those tests once we put the polyurethane bag into the device. Natrix was successfully then deployed and used in 30 actual patient surgeries successfully. There wasn't one single bag failure, including Medtronic had their representative, Ann Heike, whose deposition testimony was read at trial, but it's in evidence at the trial, attended those and said the device worked very well, had nothing but laudatory things to say. They also had one of their doctors, Dr. Gordon, during physician preference testing, use our device. He said nothing but laudatory things. I heard my opponent say that this leaked during the physician preferences. This leaked. It's just fabrication. There is nothing in the record that shows there was any problem with this bag after the materials were changed sometime about February or March of 2007. We ran our own internal tests. We have the testimony of John Wynn, our test engineer, testimony of Nick Herbert, Dave Look, all in the record saying it never failed a test. We have the 30 different successful surgeries used, two of which were presented by Medtronic people. Then that's all done in 2007, early 2008. Due diligence is being done with vast due diligence teams of 20 to 30 people from Medtronic visiting at least two or three times our facilities and going through the device. It comes to June of 2008, we receive an email from the corporate headquarters of Medtronic in Minneapolis saying they want us to ship 20 of our guns to them, which we did, for testing. So we sent them 20 guns. After we did our test, after we did 30 successful patient surgeries, we sent them 20 guns. They test. Bob White, who was their divisional president, essentially the CEO of Kaifon Searle, testified at trial. So we would not have closed this had these 20 guns not been tested and passed those tests. So contrary to the suggestion by my opponent, all of the undisputed evidence is that the bags never leaked, never had a problem. And I'll get on. Well, until? Until, after closing. Until when? After closing. So when is the closing? The closing is August 7, 2008. And by the way, the contract is dated August 7. So the contract was negotiated and signed after six, seven months of due diligence, the PPTs, the testing by Medtronic. And there's that knowledge limitation, which we cited. We brought to the court's attention some additional Delaware case. This contract is governed by Delaware law. Sophisticated parties, they like Delaware law. Knowledge limitations for actual knowledge are well recognized under Delaware law where you have to prove two things. There's no contrary case for Delaware where the burden is on the warranty, in this case Medtronic, to show, A, a defect, and, B, that we had actual knowledge. And if they can't show both, they lose. In this case, they couldn't show either that there was a defect in the saline bag or actual knowledge. So now let me turn to the post-closing evidence that I heard my opponent refer to. Post-closing, they immediately directed us to ship in bulk shipping, which is taking our matrix system guns, putting them in pouch or bags, 20 at a time, and put 40 in a box, shipping them up. That was not part of what we warranted. We've never shipped any product like that before. When they arrived, the testimony at the Medtronic end was they were leaking. There was leaks, and not from the bags, because caps fell off because they were in these uncontained. We had a thorough form tray that they sat in. They asked us not to put them in that. We put them loosely in big bags, throw them in a box because that's what they asked us to do, and guess what? Caps fell off. So, yeah, they found some water. So this is the continual problem that we have with the record in this case. They say, oh, there was water. There was a leak. Therefore, ipso facto, it's a saline bag. There is no ipso facto it was a saline bag evidence in this case. All of these so-called. Was there any other liquid that could have leaked? Well, no. It was shipped. So the product was shipped intact with the saline bag attached. Yeah. You weren't supplying your own saline when you get the Natrex. Correct. And when they were shipped and they were open, the evidence from the Medtronic receiving department and from the lead test engineer, Mr. Wong, and we cited his testimony, the only time there was a bag failure that he knew, and he was the lead test engineer on Medtronic, was after they put it through their testing. So I need to talk about what they did, which was vastly different than what we did. We tested the device in what we call the Alicart configuration, a single device packaging. On the eve of closing, as referenced by my opponent, we discovered that our packaging test failed. We called immediately. And they said, we don't care. We're not going to sell your device in your packaging. We're going to bundle it. We're a big company. We've got lots of other good stuff to sell at the same time. We'll put it in this big box with all this other Medtronic stuff when we sell it, because we can make more money doing it that way, which was their prerogative, and that was fine. So when they closed this transaction, they knew they were going to take our device and put it into a brand-new untested packaging. And that packaging was much larger. It included other devices. It was much heavier. Then they decided they were going to test it to Level Assurance 1, which is the highest level test. Not required. We did Level Assurance 2, which is a lower level testing, but industry standard, because we only had one device that we were packaging. So their new packaging configuration increased the radiation dosage by 40 percent, the vibration factor by 50 percent, the drop test, how far they dropped it by 50 percent. The weight of the box, as we know, is far heavier and bigger. We actually had the box in front of the jury. We showed what a kypho pack looked like versus an aliquot tray that we had. And the testimony from Mr. Wong, their lead engineer, said, our overly aggressive testing, ours, Medtronics, caused the seams to fail in the back. This is a case, frankly, with the evidence that was adduced to trial, we could have probably secured summary judgment. There was no evidence whatsoever of a defective bag until such time as they ran it through their, in their words, overly aggressive testing, which was not part of our warranty. They can do that all they want. We didn't warrant that. So when they took our device and they put it through something that we didn't know anything about, that was on them. But there is more than substantial evidence. I mean, there's almost undisputed evidence that the bag never failed. And they've cherry-picked certain selections out of our test data. At what point did they use the blue dye? That was done after the APA closed and after we shipped the guns to them. That was done, again, by Medtronic, not by us. Were you shipping guns to Medtronic with the blue dye in them? No. My recollection of the record is that we sent them the guns and they received them and tested them. And that's the other part of this. When they received our guns, which kind of defies common sense and logic, which was something we pointed out to the jury, they inspected them because they opened them. These were not in any kind of container. They were in a box. They were put in. And the reason they wanted those guns is because they needed to sterilize them and put them in the Kyfo pack and then send that out for packaging testing. It defies common sense and logic that anybody that would open this up and see a bag that was leaking or a gun would send them out for testing. They were sending all of these out for testing. So there's absolutely no credibility to the statement that there was any issue with the bags at the time. There was some evidence that the caps fell off. We called them. They admitted, in fact, in emails that, yes, it's because of the bulk shipping that we asked you to send these in this crazy way of bags 20 at a time thrown loosely in. So the remedy, they came back to us, and there's an email confirming it from Mr. Wong saying, We've never seen any evidence of leaks when they're shipped in the Pabin's Alicart single tray packages. So please, to solve this leaking problem on shipping after closing, please tell Pabin to send everything back in their original tray because it was a protected bedding inside the tray which the device sat in. And we did that. That solved the problem. The caps solved the problem. We put shipping in these bulk packaging. Then the only problem with the bag starts and ends with Mr. Wong's testimony, which he confirmed the only time the bags ever failed was after they went through this overly aggressive level 1 assurance level testing that we never did, and we never warranted. So the evidence is there's no evidence of any bags. What they cherry-picked is a few statements here and there, which were all, as pointed out by the court here, brought up in time. The various witnesses were examined. Oh, you have a test data sheet that there was a drop in the tray. Mr. Wynn was cross-examined. He said, Yeah, it had nothing to do with the saline bag. And the questioning went, Well, how much water was in there? Well, one drop, maybe two drops. And this is in the record, a drop, one milliliter, which is a very small quantity, equals 13 drops. So if you're saying there's one or two drops, you're talking about basically 0.1 or 0.2 of a milliliter, just simple pieces of water. So they want to conflate, which they tried to do with the jury. The jury saw through it. They want to conflate, Okay, we got a little evidence of a drop in the tray. That means your bag failed. There's absolutely no evidence that the bag failed. The same thing with the PPT evidence that was referred to by my opponent. The PPT evidence showed that when the physicians used it, we had a wingtip pressure relief valve on the original design of the device. The doctor, which was intended to, after use, intended to discharge water. It wasn't a defect. That was the design of it. The doctors just didn't like that. We modified the design, which is one of the reasons due to PPT, to make sure, A, it performed successfully, which it did, and to see how you can enhance the design of your product. So before we ever sold the device to them, the wingtip valve that she's referring to, the evidence that she would refer to of leaking in the PPT was, A, it wasn't leaking. It was an intentional discharge by design. And, B, that valve wasn't even on the device that they acquired, and they know that. That was shown in the design history file. They know they didn't buy a device that had a pressure relief valve. The only other evidence that they could possibly cite to is the evidence of a Brian Donovan, who was a very interesting witness at trial. Mr. Donovan said, well, I saw water and impressed, because, again, they were lacking the connection between seeing some water and the bags. He finally said, well, yeah, I think I saw some tears in the bag on bulk shipping. He's the only witness that even hinted at this. So that's the only evidence. The great weight of the evidence is, as I described. However, Mr. Donovan's testimony was contradicted by Mr. Wong of Medtronic. He's internally inconsistent. Mr. Wong said, this never happened. The only time these bags split was when we put them through our overly aggressive testing. So we have a big problem with Mr. Donovan's credibility. First off, he's contradicted internally. Second, he admits he never sent an e-mail or made any report of a saline bag leak when he opened up the shipped devices. Never sent any contemporaneous documents, something important like that. Yeah. He said, yeah, we normally would. I just didn't do it. So we know that. And then on top of that, Mr. Donovan, at the time of the trial, was a former employee. No longer with Kai Fonzaro. But they brought him in on their case. And I had the opportunity to cross-examine Mr. Donovan. And Mr. Donovan, under oath, on direct, said, I'm here. Mr. Thomas, you're down to a minute and 20 seconds. I'd like to hear at least a short response to the argument about the erroneous jury instruction. Well, the court interpreted the ‑‑ and it's in the record. Her interpretation of the contract pretrial was well reasoned. They say it was ‑‑ I agree. It was good enough to be sold because the Natrix system definition does not include packaging. Everybody in the industry, including in the court, knows you can't sell a medical device unless you put it in sterilized packaging that's been validated. The court properly interpreted the definition. In fact, that was asked for in part by Medtronic at the contract interpretation. Good enough to be sold. Because it couldn't be sold. So this conflation of, oh, it had to be saleable, or Mr. Herbert admits he couldn't sell it, of course he admits he can't sell it because you can't sell the Natrix system without putting inside a validated packaging. So when they bought the Natrix system, they understood they were getting something that they could put inside a validated packaging system of whatever design they wanted, but it couldn't be sold immediately. So the court's definition was, A, proper, it was B, requested in part by them. C, they never challenged, they never asked for jury instruction that saleable, commercialable, all these words that are under brief. Ready to sell. I mean, this concept that this had to be ready to sell. The minute some witness pops up and says, you know, you can't sell it because it doesn't have packaging, somehow they win this case. It's at odds with how the court interpreted it. They never challenged that. In fact, even on appeal, they agreed. The court did a well-reasoned decision on the contract interpretation. So I am mystified to find how they are arriving at some kind of flaw with this. The court correctly decided that good enough to be sold was the narrow, limited way that this could only work, and correctly decided under Delaware law that the knowledge limitation put the burden, yes, the burden was on them, and that's what Delaware law says. The warrantee's burden then is to show actual knowledge, a defect number one, and actual knowledge number two, and we have plenty of good case authority, both in our brief and our supplemental brief. So if there's anything else I can add to the court, I would be happy to do that. No further questions. Thank you, Mr. Thomas. Mr. Mignone, I think you have some time remaining. Oh, I do? Okay. No, I'm sorry. Mr. Mignone has time remaining. Your time is, you're over your time. I'm done. Your Honor, to speed things up, I would ask the court to look at our reply brief at page 9 with references to the record about leaking. Begins in late 2007, physicians involved in the testing reported leaking of the saline and I won't burden you with them at this point. In early 2008, the leaky saline bags continued to cause the device to fail the tests. In April of 2008, it continued to fail. Now, remember the bags were changed from polyethylene to polyurethane in mid-2007, so all of this is after the bag change. Then, right before the due diligence meeting that they refer to, the tolerance level for the bags was changed so that they could say that the bag had passed the tests. Nothing had changed except that the tolerance levels had changed. After the agreement was closed, I didn't hear anything that talked about the devices that were sent in the Paban packaging. They weren't all sent in bulk packaging. The evidence is undisputed that they were sent some in bulk packaging and some in the packaging that Paban provided. It's the same with the blue dye tests. Counsel remembers incorrectly. I read the record before I came to the court, and the record reflects that Kaifansarl went to Paban with the blue dye and asked them to put it in 60 devices and send those 60 devices 30 in their packaging and 30 bulk packaging, and that when it got to Kaifansarl, they all leaked. But the devices that came in Paban's packaging leaked. So to say that that's not in the record is simply not accurate. And then he doesn't explain how on August 27, 2008, 20 days after the agreement was signed and after all of the problems with the bags had been brought to the attention of Paban, Bill Stark, the director of manufacturing, stated that it appears that the welded seam on the saline bag is faulty. That's what we're talking about here. That's what the evidence is. It's not the smoke and mirrors of packaging or vigorous testing. It is the fact that the saline bags leaked from the beginning. They leaked all the way through the process. And for that reason, we're entitled to judgment. Your Honors, did you want to hear anything about the attorney fee issue? No, I think we understand that. Okay, great. Thank you very much. Paban Development v. Kaifansarl is ordered submitted, and the Court stands adjourned. All rise.
judges: Tashima, Bybee, Zipps